IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

EKOPEL D.O.O.
(a Slovenian company)
Ulica Goce Delčeva 36, Ljubljana, Slovenia

Plaintiffs,

v.

CITIBANK N.A.
(a national banking institution),
aka CITIGROUP aka CITI
1225 Connecticut Avenue, N.W.
Washington, DC 20036

and DOES 1-5

Defendants.

ACTION No. 1:22-cv-02554-JDB

**MEMORANDUM**

**OF PLAINTIFF EKOPEL D.O.O.**

**IN OPPOSITION TO THE MOTION TO DISMISS OF DEFENDANT CITIBANK N.A.**

## PREAMBLE.

Plaintiff EKOPEL D.O.O. ("EKOPEL") respectfully submits its Memorandum in Opposition to the Motion to Dismiss ("MTD"), brought by Defendant CITIBANK, N.A. ("CITIBANK"), Dkt 17.

This action is about CITIBANK's making numerous misrepresentations to EKOPEL and other banks that it did not hold $590,000, the subject matter of this case, and that it had wired those funds out. CITIBANK's representations were false, as that fact is now irrefutably proven. The alleged facts establish that CITIBANK converted the funds, denied holding those, avoided returning those, and disgorged the money it did not own only after this action was brought.

The MTD has no merit because any attempts of CITIBANK to shield it against its liability by referring to and relying on, Executive Orders and statutes, do not apply to EKOPEL. Instead, it was CITIBANK that acted in bad faith. The Amended Complaint's ("AC") allegations overwhelmingly show that CITIBANK's misrepresentations and conversion of the money it did not own constituted bad faith. To quote a quintessential statement,

> "118. If this action had not been filed, CITIBANK, **acting in bad faith**, would have kept the money as its own capital, since it did not file an interpleader, put the funds in a specific Escrow, nor disclose it to any party that CITIBANK held the funds. Based on this and prior denials, CITIBANK did not intend to return the funds." AC, ¶118.

### A. OUTLINE OF THE FACTS RELEVANT TO THIS ACTION.

The AC provided a very detailed description of the facts. Tracking the summary in the AC, EKOPEL, an exporter of medical equipment and medications in Slovenia, brought this action, as the intended beneficiary of two wire transfers in March of 2022, for $545,000 and $45,000, withheld by CITIBANK, never reached the beneficiary. Only after this action was filed were the funds returned to the Ukrainian payers overseas. EKOPEL, acting on its behalf and as an assignee of the claims of two Ukrainian payers, makes claims against the banking institution that

mishandled wire transfers and made multiple misrepresentations, effectively converting the funds. Before bringing this action, EKOPEL made inquiries with several banks regarding tracing the funds, including one action initiated in this Court. As it turned out, CITIBANK was responsible for holding the money in the broken chain of the wire transfers. While secretly holding the funds, CITIBANK did not respond to the numerous inquiries made on behalf of the plaintiffs to provide copies of the documents showing the wire transfers. CITIBANK made repeated misrepresentations, in writing, that it did not hold those funds. This action has a related case in this Court, 1:22-cv-02350, *EKOPEL v. BNY Mellon*. BNY Mellon has settled the claims in that other action, which has been resolved. As a prima facie false statement by CITIBANK, denying holding EKOPEL's funds, the AC attached Exhibit 1, which established, pro verbatim, that CITIBANK denied it held the funds and kept them to itself until this action was brought.

The most relevant facts as to the transactions pleaded in the AC stated:

> "8. … on March 1, 2022, Sberbank's subsidiary in Ljyubljuana was purchased and taken over by a local Slovenian bank which obtained all shares of that subsidiary. (…"[A]ll shares of the group's Slovenian subsidiary Sberbank banka d.d. to Nova Ljubljanska banka d.d. (NLB d.d., in translation New Ljubljana Bank). The banks will open on Wednesday, 2 March, as normal with no disruption to depositors or clients"). See: https://www.srb.europa.eu/en/content/sberbank-europe-ag-croatian-and-slovenian-subsidiaries-resume-operations-after-being-sold
>
> 9. As it is common for acquiring banks, NLD d.d. Bank, as the successor, continued to use the SWIFT instructions from the acquired bank, Sberbank's subsidiary in Slovenia, in addition to importing all accounts from the acquired institution. At the time of transactions, the destination bank to which the funds were wired was NLD d.d., a Slovenian bank.
>
> 10. The subject transfers were initiated more than two weeks later, on March 16 and 25, 2022, after Sberbank's subsidiary was purchased by a local bank, NLB d.d. Bank, taking over all its transactions.
>
> 11. The purchaser, NLB d.d. Bank, to which the wire transfers were directed, has never been under any sanctions."

The most fundamental for this action fact followed July 15, 2022, when EKOPEL, through its American counsel, sent letters to the General Counsel's Office of CITIBANK. See Exhibit 1 to the AC. In response to a very detailed letter, EKOPEL's counsel. CITIBANK's office of the General Counsel responded, quoting from the AC:

> "72. On July 25, 2022, CITIBANK responded that "…Upon review of the details provided in your inquiry, we were able to confirm the payment under UETR xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxf03b was received our reference number XXXXXXXXX0201 in the amount of $545,000.00 and **has been returned to the remitter** under E2220840005504. In addition, we also confirmed the payment under UETR xxxxxxxxxxxxxxxxxxxxxxxxxxxxx011d was received under our reference number xxxxxxxxxx0F01 in the amount of $45,000.00 and **was returned** under a new reference number xxxxxxxxx20F04." See Exhibit 1 to the AC."

As it turned out later, CITIBANK, implying it returned funds to BNY Mellon, provided false information to EKOPEL. By doing so, CITIBANK forced EKOPEL to file a lawsuit against BNY Mellon. It is possible that CITIBANK expected EKOPEL to write off the funds, against the denials of the banks; returning the funds looked more and more like *a mission impossible*. However, EKOPEL did file a lawsuit against BNY Mellon, obtained with the cooperation of that bank additional information and evidence, pointing to CITIBANK as the bank that had converted EKOPEL's money.

This Court should deduce that a national bank's lying in a letter to an American attorney representing a foreign owner of the funds is unspeakable. Providing false information to convert funds is not allowed by any banking statutes or regulations, as discussed in more detail below.

**B. SUMMARY OF POINTS IN OPPOSITION.**

1. CITIBANK's Exhibits A-J are, to a large degree, illegible when the submitted text for reading is reduced to, instead of regular font 12 pt to font 2 pt, making proper consideration of CITIBANK's Exhibits handicapped or impossible. The Court could treat CITIBANK's

submitting Exhibits, in most part illegible, as a lack of respect not only to the plaintiffs but also to the Court, to which attention such Exhibits are submitted.

2. None of CITIBANK's Exhibits A-J annexed to MTD, was authenticated by any Affidavit. As opposed to pleading's Exhibits 2 and 3, expressly allowed for pleadings, the lack of authentication of Exhibits the MTD refers to is fatal to the MTD. CITIBANK's Exhibits A-J should be ignored or stricken; at a minimum, all references to those in the MTD should be ignored.

3. An MTD stripped of considering unauthenticated exhibits does not remotely approach the requirements of F.R.Civ.P. 12(b)(1) and (12)(b)(6). The MTD should be treated as a Summary Judgment Motion ("SJM") and denied on its facial insufficiency as such at a threshold.

4. The MTD suggesting, in 9 (nine) instances, to take judicial notice does not remotely approach the requirements for proper requests to the Court to take judicial notice, annexing what exactly documents or facts CITIBANK proposes to the Court to judicially notice, abysmally fails under F.R.E. 201.

5. Where the AC alleged "bad faith" in 5 (five concrete instances), ¶¶87, 109, 118, 129, and 142, backed on facts and documents, the MTD's citing the language "good faith" 13 times was wholly misplaced, with the case law inapposite.

6. CITIBANK's misrepresentations of not holding the funds, made to convert EKOPEL's money, exemplify "bad faith."

7. CITIBANK's conversion of money, treating the money as the bank's own without placing it on an escrow account, filing an interpleader action, or applying to the U.S. Department of the Treasury to either allow or prohibit a transaction, making false statements

to other parties, denying that money was at the bank, is a quintessential embodiment of "bad faith."

8. CITIBANK was free to choose any banking route to wire transfer the funds to the EKOPEL account at the Slovenian bank (previously Sberbank's subsidiary). CITIBANK's own decision to route the funds through an allegedly sanctioned bank enhanced CITIBANK's liability and reinforced the showing of its bad faith.

**C. CITIBANK'S CONVERSION AND MISREPRESENTATIONS WERE NOT JUSTIFIED UNDER THE ACTS IT CITED.**

CITIBANK is in denial that it cannot hide behind the statutes that are inapposite here. CITIBANK argued that the claims against it are allegedly "barred under the International Emergency Economic Powers Act ("IEEPA") and the Uniform Commercial Code ("U.C.C."). Concerning IEEPA, CITIBANK failed to point to any provision in that Act that would allow it to: (A) make false statements to other parties concerning the claimed funds; (B) undertake fraudulent concealment that it held the claimed funds; (C) convert money not belonging to CITIBANK; (D) interfere with the beneficial business relationship.

Likewise, <u>nothing in U.C.C. allows a bank to lie to other banks</u> and consequently to the title holders that CITIBANK did not hold funds, whereas it did hold the funds. Nothing under U.C.C. allows a bank to conceal the truth, before other banks and consequently before the title holders of the funds, that the funds, nor does U.C.C. allow to convert anyone's funds, absorbing those into its operating capital or corporate assets, as CITIBANK did.

CITIBANK's reliance on 50 U.S.C. Section 1702 without foundation because that Section is applicable only when, as stated in the previous Section, "…(b)The authorities granted to the President by section 1702 of this title may only be exercised to deal with an unusual and

extraordinary threat with respect to which a national emergency has been declared.…" No emergency has been declared concerning importers in Ukraine and exporters in Slovenia.

CITIBANK has been continuously in denial of the facts. On March 1, 2022, Sberbank's subsidiary in Ljyubljuana was purchased and taken over by a local bank that obtained all subsidiary shares. (…"[A]ll shares of the group's Slovenian subsidiary Sberbank banka d.d. to Nova ljubljanska banka d.d. (NLB d.d.). The banks will open on Wednesday, 2 March, as normal with no disruption to depositors or clients"). See: https://www.srb.europa.eu/en/content/sberbank-europe-ag-croatian-and-slovenian-subsidiaries-resume-operations-after-being-sold

The subject transfers were initiated on March 16 and 25, 2022, **after Sberbank's subsidiary was purchased by a local bank**, NLB d.d., taking over the transactions. CITIBANK failed to identify what concrete sanctions were issued against NLB d.d. by the number(s) of the instrument(s) because there were none.

Regarding UCC, those regulations generally belong to State statutes and are displaced by federal statutes if a conflict arises. Reference is made to 15 U.S. Code Subchapter VI - ELECTRONIC FUND TRANSFERS, § 1693. 'Congressional findings and declaration of purpose,' et seq. One of the statutes is § 1693h, 'Liability of financial institutions. The federal statutes supersede any State law if there is any conflict.

For example, *Grain Traders, Inc. v. CITIBANK, N.A.*, 160 F.3d 97 (1998), is about the UCC, not federal statutes ("UCC precluded common law claims"). It is not about the interaction of the federal and State statutes, the latter being preempted. As shown in the AC, CITIBANK provided false information to other banks and the plaintiffs' representatives, which is not exempted—nor could be exempted under the maxims of the law—from CITIBANK's liability.

When CITIBANK made false representations, CITIBANK held the funds, causing to mount ever-growing damages and triggering unnecessary expenditures on the side of EKOPEL and two Ukrainian importers.

D. **PLAINTIFF'S OBJECTIONS TO CITIBANK'S SUBMITTING UNAUTHENTICATED EXHIBITS TO ITS MOTION**.

On the presentation side, CITIBANK's unauthenticated Exhibits, attached to the Motion, contain text reduced from a standard font of 12 pt, used in the Court, to font 2 pt[1], making the text effectively illegible and information highly confusing. CITIBANK has squadrons of high-tech specialists who could have clarified the displayed information to any reader, particularly for a District Court. Whereas CITIBANK, axiomatically, has had resources to create legible and clear exhibits, the Court should refuse to consider those, along with any references to Exhibits in the MTD.

CITIBANK's failure to file an Affidavit authenticating the exhibits attached to the MTD speaks volumes, inadmissibility being only a tiny problem in that failure. A comparison of the Plaintiffs' group exhibits 2 and 3, attached to the AC, shows that those are different documents.

As a threshold step, CITIBANK was obligated to submit an Affidavit from someone from the bank to authenticate those documents. It is axiomatic that without authentication of documents as "true and correct" copies of the existing original sets, the Court should not—or may not—even consider those.

However, a failure to submit an Affidavit is highly relevant because an Affiant should have also explained where the documents came from, that they were authorized to authenticate those, and, presumably, provide some explanations. CITIBANK avoided doing so. The actual explanation is relatively simple. Apparently, nobody at CITIBANK agreed to provide such an

[1] A font is measured in pt (points), showing the height of the letters; there are 72 points in one inch.

Affidavit and become identified as a witness. As shown elsewhere, CITIBANK had numerous routes to send the wire to the Slovenian bank, and CITIBANK chose to route it through a subsidiary of Sberbank. CITIBANK decided to route the funds to a Sberbank subsidiary (of which EKOPEL was unaware, referring to it as possibly an "unidentified intermediary bank"). The blame is on CITIBANK for disobeying the applicable Executive Orders and statutes, not EKOPEL, which had no knowledge nor control over what CITIBANK was doing with EKOPEL's money.

**E. CITIBANK'S PARTIALLY ILLEGIBLE EXHIBITS, WITH ARROWS, MARKINGS, AND COMMENTS, BELONG TO MATERIALS ACCOMPANYING AN EXPERT DECLARATION, ALL IGNORING F.R.E. 702-705.**

As a threshold matter, EKOPEL makes a definite objection to CITIBANK's submitting Exhibits that contain essentially illegible text in their most essential portions. Instead of a regular font 12, using the federal courts, CITIBANK's Exhibits contain essential portions of text in what appears to be font 2, or about six times smaller than the regular font. Texts in such a font should be treated. Neither the Court nor EKOPEL should be required to use a magnifying lens, other magnifying devices, or spectacles of extraordinary strength. Moreover, when magnification is made, the other portions of the pages cannot be seen. Of course, CITIBANK had an opportunity and resources to submit exhibits containing text in legible fonts without giving the Court and the plaintiffs the hurdle to consider those. Grossly disparate fonts, used by CITIBANK for the Court submission, disallow to view of complete Exhibit(s) as a whole. EKOPEL submits CITIBANK did so on purpose, to handicap consideration and confuse the Court and EKOPEL, what is what, which should be rejected.

Not only that. The type of additions, entries, arrows, and somebody's comments on CITIBANK's proposed Exhibits A-J belong to a typical series of exhibits to an expert declaration with opinions. However, CITIBANK failed to file any expert declaration, and CITIBANK's submission, Dkt 17, in part of the MTD belonging to the area of expert opinion, all in contravention

of F.R.E. 702-705.[2] If and when CITIBANK comes up with expert witnesses' exhibits, it must come along with an expert's declaration or report, with an opportunity for EKOPEL to retain its own expert and to provide a rebuttal expert opinion. Axiomatically, MTD is improper for presenting products of someone, undisclosed, expert opinion exhibits.

### F. CITIBANK'S FAILURE TO ANNEX CONCRETE EXECUTIVE ORDERS AND THE TREASURY DEPARTMENT, PURPORTEDLY OPERATING AGAINST UKRAINIAN IMPORTERS AND SLOVENIAN EXPORTERS.

CITIBANK undertook a strange, if not bizarre, attempt to convince the Court and the plaintiffs that any sanctions imposed by the Executive Orders or the instruments of the Treasury Department should apply to the **Ukrainian importers** of medical equipment[3] and the **Slovenian exporters**[4]. CITIBANK's logic puts due analysis on its head. The sanctions were imposed against the Russian invaders, not the victims. It is the general policy objective of the U.S. to support Ukrainian defenders, <u>not to punish the Ukrainian importers of medical equipment</u>, as CITIBANK did.

---

[2] Rule 702. Testimony by Expert Witnesses; Rule 703. Bases of an Expert's Opinion Testimony; Rule 704. Opinion on an Ultimate Issue; Rule 705. Disclosing the Facts or Data Underlying an Expert's Opinion.

[3] The AC properly pleaded: "2. EKOPEL is Plaintiff on its own behalf and as the assignee of two Ukrainian importers of medical equipment and medications that paid in March of 2022 the funds, subsequently converted by the defendant, until disgorging the funds after this action was filed. Namely, EKOPEL is the assignee of the claims in this action of Equipmed LLC, a Ukrainian company, which wire transferred (in the format of MT103) from a bank in Ukraine to EKOPEL $45,000 as payment for medical equipment. EKOPEL is also the assignee of Ukr Med Service LLC, a Ukrainian company that wire transferred to EKOPEL on March 25, 2022, for $545,000."

[4] That the plaintiff had nothing to do with Russia is prima facie clear from the AC: "1. Plaintiff EKOPEL D.O.O. (EKOPEL) is a company incorporated in Slovenia. EKOPEL was founded in 2014. EKOPEL's address is Ulica Goce Delčeva 36, Ljubljana, Slovenia, tel.: +386 41 363748. EKOPEL specializes in the exports of medical equipment and investment projects in the medical and social services sector on a turnkey basis. Information on EKOPEL can be found in the public domain on its website https://www.EKOPEL.org/."

For example, if CITIBANK had relied on the White House's Executive Orders concerning Russia, e.g., 14024, 14065, 1466, and 14068, CITIBANK was obligated to annex those, points to a page and applicable paragraph, and ask the Court to take judicial notice. CITIBANK failed because it knew that nothing applied to Ukrainian importers and Slovenian exporters of medical equipment.

Likewise, if CITIBANK sought to rely on specific instruments of the U.S. Department of the Treasury, typically captioned Directives, it was obligated to annex those to the MTD.[5] While agencies' documents are not necessarily judicially noticeable under F.R.E. 201, CITIBANK would have had an obligation to submit at least an authenticating affidavit, better pointing to the paragraphs that would allow applying sanctions against Ukrainian importers and Slovenian exporters of medical equipment.[6]

[5] The AC enumerated the instances when CITIBANK misused references to the instruments of the U.S. Department of the Treasury, to wit "108. Likewise, after the fact, CITIBANK attempted to justify its misconduct by Directive 2 of the Office of Foreign Assets Control under Executive Order 14024, whose Annex 1 listed the financial institutions subject to the sanctions. 109. However, that list did not contain the names of any banking institutions in Slovenia. The country, Slovenia, is not on that list either. Therefore, that Directive was also inapplicable, whereas CITIBANK cited it post-factum in bad faith. 110. Likewise, CITIBANK's attorneys justified the bank's misconduct by referring to Directive 3 of the Office of Foreign Assets Control. That Directive was also irrelevant because Sberbank had 0 (zero) stake in the Slovenian banks at the time of the wire transfers."

[6] The AC showed the attempts on the side of CITIBANK to misapply sanctions, to wit: "104. For example, CITIBANK intentionally misinterpreted the Executive Order of April 15, 2021, titled 'On Blocking Property with Respect to Specified Harmful Foreign Activities of the Government of the Russian Federation,' as a warrant to make misrepresentations to multiple institutional parties and ultimately to EKOPEL's American counsel." Nothing in that Order, or similarly-issued instruments, allowed CITIBANK to misrepresent facts, converting the other parties' funds. Notably, there were no Russian nationals involved in EKOPEL or in the experts-imports transactions necessary to strengthen the defense of Ukraine, defending in a war against a superior adversary.

It was not incidental that CITIBANK failed to submit any instruments, pointing to concrete paragraphs on how that could affect transactions. CITIBANK failed to meet its burden to annex the concrete Executive Orders or Directives for the Court and EKOPEL to review whether CITIBANK's reliance had any ground at all.

In any event, **none of the sanction instruments**, even if*, arguendo*, truly applicable, which they were not, **authorizes or allows CITIBANK or any other national bank to make false statements to the owners of the funds that CITIBANK did not hold $590,000**.

In the end, CITIBANK, acting egregiously, punished the wrong parties, with the consequences stated as follows:

> "111. CITIBANK's misrepresentations, concealment, and conversion, until this action forced CITIBANK to disgorge the funds, entailed deplorable consequences in the importers' country Ukraine. For example, one medical equipment unit was imported for the National Guard of Ukraine, Unit 3070. Under Agreement No. 52MS of March 3, 2022, the subject payment was made to deliver PRC Trademark United Imaging, product serial number S/N 353083. These and other equipment units are used for Tomography X-rays. That equipment was imported, on that occasion, under specific and known circumstances, to save lives in Ukraine." (Underlying added).

**G. CITIBANK FAILED TO SHOW IT APPLIED TO OFAC FOR A LICENSE TO TRANSFER THE FUNDS OR REJECT THOSE.**

EKOPEL duly pleaded that CITIBANK had options open to dealing with the funds legally instead of converting the funds. EKOPEL pleaded the options available to CITIBANK: "95. If CITIBANK had bona fide intentions, it had numerous options not to damage EKOPEL and its assignors. Those options could have included: (A) interpleader action; (B) setting the funds in a special trust account, not to treat the funds as its own; (C) truthfully informing the victims of the misconduct, namely EKOPEL, and its assignors, of the circumstances and procedures; (D) applying for a permit from the U.S. Treasury for a license for forwarding funds as BNYM

accomplished; and (E) suggesting to EKOPEL and its assignors to apply to the U.S. Treasury for a license for forwarding funds." EKOPEL will address those options one by one.

If CITIBANK had any genuine concern with the funds and the transfers, CITIBANK knew that the standard *modus operandi* was to apply to the U.S. Department of Treasury's Office of Foreign Assets Control's application page. The procedure is well established. All it would have taken for CITIBANK was to file an application and get the response either way: approved or declined. See the link: https://ofac.treasury.gov/ofac-license-application-page

If CITIBANK had acted in good faith, which it did not, it would now submit its Number of the application to OFAC for a license, with the date, with a copy of the application. That procedure is routine. Based on the MTD, CITIBANK failed to apply for a license, simply resolving to keep the money for itself.

Demonstratively, the correspondent bank before CITIBANK, BNY Mellon, applied to OFAC and received a license to return the funds to EKOPEL before it did so. That shows that CITIBANK failed in its obligations and acted in bad faith.

**H. CITIBANK FAILED TO FILE INTERPLEADER ACTION UNDER RULE 22**

CITIBANK acted in bad faith, expecting to deprive EKOPEL of its money, because it failed to file an interpleader action, asking the Court to resolve whom the money belongs to. The mechanism is simple: "(1) By a Plaintiff. Persons with claims that may expose a plaintiff to double or multiple liability may be joined as defendants and required to interplead. Joinder for interpleader is proper even though: (A) the claims of the several claimants, or the titles on which their claims depend, lack a common origin or are adverse and independent rather than identical…."

CITIBANK could have joined in an interpleader action either by the senders of the money, the two Ukrainian importers, EKOPEL, or all three parties. The preferred procedure for CITIBANK would have been to disgorge the money and pay it to the Court under Rule 67. The

Rule provides, in particular: "(a) Depositing Property. If any part of the relief sought is a money judgment or the disposition of a sum of money or some other deliverable thing, a party—on notice to every other party and by leave of Court—may deposit with the Court all or part of the money…."

**I. CITIBANK FAILED TO PUT EKOPEL'S FUNDS INTO AN ESCROW ACCOUNT.**

The minimum required step for CITIBANK would have been to put EKOPEL's $590,000 funds into an Escrow or special trust account, separate from the bank's operative funds and assets. Nothing like that is submitted in the MTD. The search of EKOPEL's and CITIBANK's Exhibits shows no single instance of putting EKOPEL's funds aside in an Escrow or a particular trust account. Instead, CITIBANK treated EKOPEL's funds as its operative funds or assets, that it was free to invest in any interest-bringing program.

In its MTD, again, CITIBANK submitted no evidence of any segregation of $590,000 and putting it on any trust account. That is consistent with the intention of CITIBANK to keep that money, meaning converting those.

Typically, a bank would first place the questioned funds on a particular trust account, sometimes called "non-liability" trust accounts. Of course, in such an instance, a bank would have an obligation to advise the parties having an interest in such funds. CITIBANK, likewise, failed to do so, according to its own MTD.

**J. APPEARANCE THAT CITIBANK VIOLATED OR ATTEMPTED TO VIOLATE THE SANCTIONS AND REGULATIONS.**

Reverting to the wire transfers of the Ukrainian importers of the medical equipment, it did not matter to them how the chain of correspondent banks would be structured. The Ukrainian importers only knew that PIVDENNYI Bank had a correspondent account at BNY Mellon. It did not matter to the Ukrainian importers and EKOPEL how the banks would secure the intra-banking settlement. It appeared that BNY Mellon transferred funds to CITIBANK. Then CITIBANK

wired funds to a bank unknown to EKOPEL and Ukrainian importers. CITIBANK was in control of wiring the funds to the next correspondent bank. The AC described the steps:

> "17. The chain of the banking accounts for those wire transfers is as follows: (A) GLOBUS Bank (Kyiv, Ukraine); (B) PIVDENNYI Bank (Odesa, Ukraine); (C) BANK OF NEW YORK MELLON; (D) CITIBANK; (E) (possibly undisclosed intermediary bank); and (F) N Banka D.D (the Slovenian Bank)."

Now, CITIBANK argues that the "possibly undisclosed intermediary bank" could be under sanctions. The response to that is clear. CITIBANK was in charge of using its own intermediate banks with correspondent accounts. EKOPEL has nothing to do with CITIBANK's correspondent agreements with various banks.

If that "possibly undisclosed intermediary bank" was allegedly under sanctions, CITIBANK could have routed the funds through another bank. The decision was nobody's but CITIBANK's, whether or not it violated or attempted to violate the sanctions.

The chain of facts shows that CITIBANK was negligent or nonperforming, with a general presumption to keep the money whenever possible. Clearly, CITIBANK was acting in violation of the banking standards. Thus, the purported re-verification of the payment order for the refund lasted from April 15 to August 26, 2022, over four months. During that time, over four months, CITIBANK did not request GLOBUS Bank in Ukraine to clarify the details of the compliance check. AC, ¶¶24-25. As an operative fact, on June 7, 2022, BNYM requested a refund from CITIBANK, but there was no response from CITIBANK again. In contravention of the banking regulations, CITIBANK failed to respond to the other banks concerning the loss of funds on approximately 15 occasions when CITIBANK was obligated to act or respond. AC, ¶¶31-64. CITIBANK's conduct was, under any standards in the banking sector, despicable. CITIBANK did not disclose per inquiries that CITIBANK held those funds, without disclosure to or secretly from the inquiring parties, from March 28 to September 20, 2022. AC ¶65.

Prior to the false letter sent to EKOPEL's counsel cited above, CITIBANK engaged in concealment before other banks. To quote, "67. After repeated inquiries, on May 3, 2022, CITIBANK responded that this bank had released the payment on April 15, 2022. However, no specifics were provided, namely to whom CITIBANK "released" the funds." As a result, EKOPEL missed, since the wire transfers (MT103s) on March 16 and 25, until their return, respectively, the amounts of $45,000 and $545,000 in the banking system, returned only on August 25 and September 20, 2022. AC ¶81. As mentioned above, …"88. CITIBANK never responded to the last demand letter of July 29, 2022, from EKOPEL's American counsel, asking for adequate disclosure of the documents."

Without the demand made in this action, as EKOPEL has shown and pleaded, it would have never received its funds back. To quote AC, "92. EKOPEL had exhausted all possible avenues to resolve the missing funds out of Court before filing the present action. EKOPEL believes that unless this action were filed, CITIBANK would get away with converting the funds with impunity."

**K. COUNT I. MISREPRESENTATION WAS ADEQUATELY PLEADED.**

The AC correctly cited the tests for pleading the claim based on misrepresentation. The AC's Exhibit 1 is a prima facie proof of a false statement made for financial benefit (to keep $590,000 for the bank). The AC enumerated the elements: "113. …(1) a misrepresentation or an omission of material fact which was false and known to be false by the defendant, (2) the misrepresentation was made to induce the plaintiff to rely upon it, (3) justifiable reliance of the plaintiff on the misrepresentation or material omission, and (4) injury: *Oxford Health Plans, Inc. v. Biomed Pharmaceuticals, Inc.* 181 A.D.3d 808, 122 N.Y.S.3d 47.

Since CITIBANK has cited cases from New York or the 2nd Circuit, EKOPEL will follow with a citation accordingly. The essential elements of fraudulent misrepresentation are the same

across jurisdictions, in that the plaintiff must show (1) that the defendant made a material misrepresentation, with (2) scienter, i.e., the intent to defraud, and (3) that the plaintiff relied on the misrepresentation to her detriment, i.e., she suffered an injury proximately caused by the misrepresentation. *In re Amla Litigation*, SDNY, 2017, 282 F.Supp.3d 751.

Exhibit 1, the response of CITIBANK of July 25, 2022, denying holding EKOPEL's funds, was only the culmination of misrepresentations by CITIBANK after the misrepresentations made to other banks. The false statement was duly quoted (repeatedly) in the AC and annexed as an Exhibit, establishing the prima facie proof of misrepresentation. Moreover, there was an aggravating circumstance; the response was sent to the formal inquiry with CITIBANK's General Counsel's Office; therefore, the General Counsel's Office presumptively made or authorized the false information. As it follows, CITIBANK, having received both wire transfers from BNYM, falsely stated that it returned those to the remitter. Such misrepresentation resulted in the funds, $590,000, being converted.

**L. COUNT II. FRAUDULENT CONCEALMENT WAS ADEQUATELY PLEADED.**

The AC quoted the tests for stating a claim based on fraudulent concealment, adding one more element to Count I: "123…. the fifth element, namely that the defendant had a duty to disclose material information and that it failed to do so. *Wiscovitch Associates, Ltd. v. Philip Morris Companies, Inc.*, 193 A.D.2d 542, 598 N.Y.S.2d 193." All five elements have been fully pleaded and shown in the AC. The essential elements of a fraudulent concealment claim under the laws of Alabama, Florida, Georgia, Kentucky, Michigan, New Jersey, New York, South Dakota, and Texas are generally: (1) a duty to disclose on the part of the defendant, (2) concealment or failure to disclose by the defendant, (3) reliance by the plaintiff, or inducement of the plaintiff to act, (4) damages, and (5) proximate causation. See *Garcia v. Chrysler Group LLC*, SDNY, 2015, 127 F.Supp.3d 212.

EKOPEL showed that when CITIBANK sent out SWIFT messages to BNYM, PIVDENNY Bank, and GLOBUS Bank, CITIBANK had the duty to disclose that it held the funds for EKOPEL, $590,000. The regulations of SWIFT, banking regulations, and practices prescribed that duty. AC, ¶124. Likewise, under the bar regulations, when the attorney for EKOPEL wrote to CITIBANK's General Counsel, his office had the duty not to conceal that CITIBANK had the funds for EKOPEL. See Exhibit 1. AC ¶125. Providing false information, under the color of banking authority, to an attorney for the victims was an aggravating circumstance. The General Counsel's Office made or authorized that false information. With regard to the banking standards, CITIBANK's fraudulent concealment affected the position of three banks: BNYM, PIVDENNYI Bank, and GLOBUS Bank. CITIBANK acted in violation of the statutes and regulations regulating banking in the U.S. and in violation of the international standards required by subscription to the SWIFT network. AC ¶130. CITIBANK's lying to the counterparty banks using SWIFT violates the basics imposed on members of SWIFT.[7]

**M. COUNT III. CONVERSION OF MONEY WAS ADEQUATELY PLEADED.**

Likewise, EKOPEL quoted the elements for claiming conversion of $590,000, to wit: "135. …CITIBANK withheld a specific, identifiable fund despite the obligation to return or otherwise treat the specific fund in question in a particular manner. *Manufacturers Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113, 124, 559 N.Y.S.2d 704. According to New York law, "[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403–04 (2d Cir.2006), quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.*, 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995). To withstand a motion to dismiss in a

---

[7] SWIFT is an acronym for the Society for Worldwide Interbank Financial Telecommunications. Since 1973, SWIFT establishes standards for financial transactions

conversion claim, a plaintiff must allege: "(1) the property subject to conversion is a specific identifiable thing; (2) the plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or the exclusion of the plaintiff's rights." *Moses v. Martin*, 360 F.Supp.2d 533, 541 (S.D.N.Y.2004) (citation and internal quotation marks omitted). *Thyroff v. Nationwide Mut. Ins*. Co., CA 2, 2006, 460 F.3d 400.

As cited above, under the bar regulations, when the attorney for EKOPEL wrote to CITIBANK's General Counsel, his office had the duty to admit that CITIBANK held the funds for EKOPEL. See Exhibit 1. CITIBANK's letter was unsigned, making it difficult to bring someone from the General Counsel's office to personal liability under the bar regulations. As adequately pleaded, "138. CITIBANK's denial of having funds amounted to conversion." That act was aggravated because it was made in an official response to a victim's attorney under the color of banking authority. The act was done or authorized by CITIBANK's General Counsel's Office. As mentioned above, CITIBANK also sent similar denials to BNYM, PIVDENNYI Bank, and GLOBUS Bank earlier.

To quote the AC: "140. Thus, CITIBANK's conversion of $590,000 was reversed only by virtue of EKOPEL's filing of this action." The true circumstances aggravated that conversion. CITIBANK's conversion caused EKOPEL's and two Ukrainian buyers' commercial losses in the payments containing information "Medical equipment," "Urgent," and "Tomographic X-Rays."

**N. COUNT IV. INTENTIONAL INTERFERENCE WITH BENEFICIAL BUSINESS RELATIONSHIPS WAS ADEQUATELY PLEADED.**

Likewise, in its text, the AC quoted the elements satisfied in this action, "146…. EKOPEL had a business relationship with two Ukrainian importers, and CITIBANK knew of that relationship. It intentionally interfered with it. CITIBANK used improper or illegal means that

amounted to causing injury to EKOPEL's relationship with two Ukrainian importers. *Fika Midwifery PLLC v. Independent Health Association, Inc*., 208 A.D.3d 1052." A claim for intentional interference with an existing or prospective economic relationship under New York law requires the pleading of facts giving rise to a plausible inference that: (1) the plaintiff had an existing or prospective business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship. *LivePerson, Inc. v. 24/7 Customer, Inc.,* SDNY, 2015, 83 F.Supp.3d 501. The allegations in the AC fully satisfy these tests.

For example, the AC pleaded: "148. Under the lawful contracts, EKOPEL was to receive funds, under contracts, from Equipmed LLC, a Ukrainian company, which wire transferred (in the format of MT103) from a bank in Ukraine to EKOPEL $45,000 as payment for medical equipment. Likewise, EKOPEL was to receive funds from Ukr Med Service LLC, a Ukrainian company, that wire transferred to EKOPEL on March 25, 2022, for $545,000." While CITIBANK caused the payments to be blocked at CITIBANK; that amounted to interference, representing tort.

**O. COUNT V. UNJUST ENRICHMENT CLAIM WAS ADEQUATELY PLEADED.**

Lastly, the AC cited the elements necessary for stating the claim based on unjust enrichment: "153. …That represented a financial benefit for CITIBANK. As shown above, EKOPEL established that (1) the other party, CITIBANK, was enriched, holding $590,000 even for more than four months; (2) at EKOPEL's expense and (3) that it is against equity and good conscience to permit the defendant to retain such a benefit. *Hochheiser v. Alin*, 59 Misc.3d 1207. To establish a defendant's liability for unjust enrichment, the plaintiff must prove, by a preponderance of the evidence, that (1) the defendant was enriched, (2) at the plaintiff's expense, and (3) equity and good conscience militate against permitting the defendant to retain what plaintiff

is seeking to recover. See *Schatzki v. Weiser Capital Management, LLC*, SDNY 2014, 995 F.Supp.2d 251.

CITIBANK failed to show that it segregated EKOPEL's funds into a separate trust account, with identifiable funds, as typical banks would do to avoid liability. Instead, it treated EKOPEL's funds as its own money, including for investing it, in a pool with other funds, in the billions in total. Because CITIBANK did not undertake to put the claimed funds into a separate trust account, failed to file an interpleader, and failed to apply for a license to wire transfer the funds entrusted to it, CITIBANK is liable on the equitable theory of unjust enrichment.

**P. SPECIFIC REBUTTAL TO CITIBANK'S RELIANCE ON EXECUTIVE ORDER THAT DOES NOT APPLY TO UKRAINIAN IMPORTERS AND SLOVENIAN EXPORTERS.**

EKOPEL addresses herewith, more specifically, the alleged source of authority for CITIBANK to convert funds to which EKOPEL had title contrary to the Executive Order provisions that CITIBANK broadly relied on, without quotation. EKOPEL needs to rebut that reliance with concrete quotations.[8]

[8] EKOPEL owes to this Court to explain why there was no activity in this case for a number of months after filing. Without entering appearance, CITIBANK's in-house counsel and then outside attorneys contacted EKOPEL's counsel and made vague promises to look into the matter, eventually settling it. That followed the fact that the letter of EKOPEL's counsel to the General Counsel of CITIBANK on July 29, 2022, still was supposed to be responded to. Despite an expectation that the response was coming, in one form or another, EKOPEL's lawful inquiry addressed to the General Counsel of CITIBANK has never been responded to. Instead of a response from the General Counsel or other authorized officials of CITIBANK, EKOPEL was only receiving a few misplaced letters debating the Russia-directed sanctions. EKOPEL pointed out then that debating sanctions was irrelevant after the wires were sent to a bank that had been acquired and was a Slovenian institution, and the buyers' using old SWIFT routing instructions was irrelevant. From the outset, EKOPEL rebutted to such an approach that nothing in any sanctions instruments allows a financial institution to make misrepresentations to the owners of funds or third parties or to have the private money embezzled. EKOPEL pointed out that the denials and the position of CITIBANK were indefensible and continuously in bad faith. The denials of responsibility, even after the action was filed, was irresponsible for a bank. Specifically, EKOPEL concluded that instead of a random mistake, CITIBANK's conduct was a deliberate

Reference is made to the Executive Order of April 15, 2021, titled 'On Blocking Property with Respect to Specified Harmful Foreign Activities of the Government of the Russian Federation,' which does not support any sanctions applied to NLB d.d. EKOPEL demonstrates herewith, textually, that CITIBANK's argument is misleading, avoiding to quote from, or point to, the provisions that are subject matters for a national emergency, one by one:

> "(a) any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, and, with respect to subsection (a)(ii) of this Section, in consultation with the Attorney General, or by the Secretary of State, in consultation with the Secretary of the Treasury, and, with respect to subsection (a)(ii) of this Section, in consultation with the Attorney General:
>
> (i) to operate or have operated in the technology sector or the defense and related materiel sector of the Russian Federation economy, or any other sector of the Russian Federation economy as may be determined by the Secretary of the Treasury, in consultation with the Secretary of State;
>
> (ii) to be responsible for or complicit in, or to have directly or indirectly engaged or attempted to engage in, any of the following for or on behalf of, or for the benefit of, directly or indirectly, the Government of the Russian Federation:
>
> (A) malicious cyber-enabled activities;
>
> (B) interference in a United States or other foreign government election;
>
> (C) actions or policies that undermine democratic processes or institutions in the United States or abroad;
>
> (D) transnational corruption;
>
> (E) assassination, murder, or other unlawful killing of, or infliction of other bodily harm against, a United States person or a citizen or national of a United States ally or partner;
>
> (F) activities that undermine the peace, security, political stability, or territorial integrity of the United States, its allies, or its partners; or

---

attempt to convert the money. CITIBANK caused a Slovenian company to rely on false information CITIBANK sent to EKOPEL's counsel. The untrue statements were made, apart from the plaintiff, also to two banks (one American and one Ukrainian bank). The confidential materials that BNY Mellon, attempting to resolve the matter, shared with EKOPEL during the settlement process indicated that there CITIBANK"S misrepresentations (and/or fraudulent concealment) established a pattern. Instead of promptly rectifying the situation and offering reasonable compensation for damages with an apology, CITIBANK engaged in further delays, wasting time and thus compounding EKOPEL's damages. CITIBANK's continued withholding of funds and denials of clear liability continued through the attempted settlement dialogue, was the manifestation of bad faith. EKOPEL should be entitled to seek compensation for all legal fees they had to undertake in the U.S., Slovenia, and Ukraine.

(G) deceptive or structured transactions or dealings to circumvent any United States sanctions, including through the use of digital currencies or assets or the use of physical assets;

(iii) to be or have been a leader, official, senior executive officer, or member of the board of directors of:

(A) the Government of the Russian Federation;

(B) an entity that has, or whose members have, engaged in any activity described in subsection (a)(ii) of this Section; or

(C) an entity whose property and interests in property are blocked pursuant to this order;

(iv) to be a political subdivision, agency, or instrumentality of the Government of the Russian Federation;

(v) to be a spouse or adult child of any person whose property and interests in property are blocked pursuant to subsection (a)(ii) or (iii) of this Section;

(vi) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of:

(A) any activity described in subsection (a)(ii) of this Section; or (B) any person whose property and interests in property are blocked pursuant to this order; or

(vii) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, the Government of the Russian Federation or any person whose property and interests in property are blocked pursuant to this order.

(b) any person determined by the Secretary of the Treasury, in consultation with the Secretary of State, to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, a government whose property and interests in property are blocked pursuant to chapter V of title 31 of the Code of Federal Regulations or another Executive Order, and to be:

(i) a citizen or national of the Russian Federation;

(ii) an entity organized under the laws of the Russian Federation or any jurisdiction within the Russian Federation (including foreign branches); or (iii) a person ordinarily resident in the Russian Federation.

(c) any person determined by the Secretary of State, in consultation with the Secretary of the Treasury, to be responsible for or complicit in, or to have directly or indirectly engaged in or attempted to engage in, cutting or disrupting gas or energy supplies to Europe, the Caucasus, or Asia, and to be:

(i) an individual who is a citizen or national of the Russian Federation; or

(ii) an entity organized under the laws of the Russian Federation or any jurisdiction within the Russian Federation (including foreign branches).

(d) The prohibitions in subsections (a), (b), and (c) of this Section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the date of this order."

**None of the above paragraph(s) on which CITIBANK purportedly relies applies to a Slovenian exporter, a Ukrainian importer, and/or a Slovenian bank** handling medical equipment payments.

The opposite is true: the attempted confiscation or delay in handling the wire transfer damaged an importer in a country aligned with the U.S. purchasing medications in Slovenia with an account with a Slovenian bank.

CITIBANK also impliedly relied on Directive 2 of the Office of Foreign Assets Control, under Executive Order 14024, 'Prohibitions Related to Correspondent or Payable-Through Accounts and Processing of Transactions Involving Certain Foreign Financial Institutions' Annex 1 lists the financial institutions that were subject to the sanctions.

That list does not contain the name of **ANY banking institutions in Slovenia**, and the name of the country, Slovenia, is not on the list. Therefore, that Directive is also inapplicable.

Reference is made to Directive 3 of the Office of Foreign Assets Control. Likewise, it is irrelevant because Sberbank had no stake in the Slovenian banks during the wire transfers.

Further, as to the superseding effect of federal regulations, those supersede UCC Article 4A: "(3) In a funds transfer to which this Article applies, in the event of an inconsistency between an applicable provision of this Article and an applicable provision of the Electronic Fund Transfer Act, the provision of the Electronic Fund Transfer Act governs to the extent of the inconsistency." NY UCC § 4-A-108 (2012). However, EKOPEL's claim for damages is not based on wholesale transfers but on individual transfers and the specific funds CITIBANK withheld from EKOPEL.

The Section cited before explains the federal legislation's purpose in 15 U.S. Code § 1693. 'Congressional findings and declaration of purpose". It says:

> "(a) Rights and liabilities undefined. The Congress finds that the use of electronic systems to transfer funds provides the potential for substantial benefits to

> consumers. However, due to the unique characteristics of such systems, the application of existing consumer protection legislation is unclear, leaving the rights and liabilities of consumers, financial institutions, and intermediaries in electronic fund transfers undefined."

Congress enacted legislation to supersede unclear provisions (such as the applicability of UCC Article 4A and its variations in various States). The presumption is clearly that the federal statutes and regulations preempt State law.

It is also axiomatic that when CITIBANK provided false responses to the inquiries, responding that it did not hold EKOPEL's funds and that EKOPEL's funds had been remitted to another bank, such business conduct may not be justified by any statutes or regulations.

**Q. PARTIAL DISCOVERY HAS BEEN OBTAINED, EXCEPT FOR CITIBANK'S STONEWALLING ATTEMPTS TO COOPERATE.**

For the Court's overview of the circumstances for this action, EKOPEL brings that to the Court's attention that all banking institutions in the chain of wire transfers have cooperated with EKOPEL, but for CITIBANK, that has persistently stonewalled all and any inquiries, including from the other banking institutions. Because CITIBANK made false statements that it did not hold EKOPEL's funds, EKOPEL was compelled to sue BNY Mellon in this Court.

In that sister case in this Court, 1:22-cv-02350, BNY Mellon, which had far less liability before EKOPEL than CITIBANK, has settled the case with EKOPEL, paying on a settlement. BNY Mellon also cooperated with evidence shedding light on what occurred, obviating discovery from that bank. Unlike CITIBANK, BNY Mellon did not misrepresent information to EKOPEL, as the evidence shows, other banks. As opposed, CITIBANK made a misrepresentation, claiming that it did not hold the funds wired for EKOPEL. Those representations to EKOPEL's counsel by CITIBANK turned out to be intentionally untrue, false, and the money was held at CITIBANK. Against that background, the Court may conclude that CITIBANK's conduct and posture

concerning converting $590,000 and treating it as its own capital have been unreasonable and unspeakable.

**R. SOME OF THE CLAIMS ASSERTED AGAINST CITIBANK BELONG TO SUMMARY JUDGMENT.**

CITIBANK's MTD also implies that the amendment of the pleading was unwarranted, even though it fully complied with Rule 15. However, there was nothing new for CITIBANK, which was alerted in advance that amendment was to follow. The amendment was proper or necessary because, when filing the Complaint, EKOPEL suspected, but was not sure, that CITIBANK converted its funds, $590,000. All that changed after this action was brought. As proof of alerting CITIBANK, Exhibit 1 to the present Memorandum shows an email letter from EKOPEL's counsel to CITIBANK's attorneys, dated March 23, 2023, that covered several areas. In particular, EKOPEL alerted CITIBANK in advance that EKOPEL is entitled to file a Motion for Partial Summary Judgment under Rule 56.

Namely, the falsity of CITIBANK's denial of holding the funds on July 15, 2023, has been proven by CITIBANK's ultimately disgorging EKOPEL's funds, $590,000, following the Complaint being filed. See Dkt 15, p. 32. Consistent with putting CITIBANK on notice and subject to the AC surviving the present challenge under Rule 12, EKOPEL intends to file a Rule 56 Motion for partial relief in a summary judgment format.

**CONCLUSION.**

CITIBANK's MTD has no merit and should be denied in all respects. In this case, the Court should find that CITIBANK's converting funds and stating to the beneficiaries and other banks that it did not hold $590,000 should be considered a serious violation of the banking regulations and common law principles. If the Court were to allow CITIBANK—or any national bank for that matter—to lie to other parties about the funds and convert funds entrusted to the inter-

banking wiring system, that would create a dangerous precedent, operating to damage the reliability of the national banking institutions in the U.S.

Respectfully submitted.

Dated: May 24, 2023

____________________*/signed George Lambert/*

George Lambert, Esq.
D.C. bar #979327
1025 Connecticut Ave., #1000 NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (800) 952 1950
Email: LawDC10@gmail.com
Attorney for EKOPEL D.O.O.

CERTIFICATE OF SERVICE

This is to certify that the preceding was served by ECF/CM on the counsel for the defendant of record:

Stephen Nickelsburg (Bar No. 475920)
202-912-5108
Steve.Nickelsburg@cliffordchance.com
Jacquelyn Desch (Bar No. 241310)
202-912-5901
Jacquelyn.Desch@cliffordchance.com
Clifford Chance US LLP
2001 K St. NW
Washington, DC 20006
Attorneys for defendant CITIBANK N.A.

Date: May 24, 2023

*/signed George Lambert/*