**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EKOPEL D.O.O.,

  Plaintiff,

   v.

CITIBANK, N.A. et al.,

  Defendants.

Civil Action No. 22-2554 (JDB)

<u>**MEMORANDUM OPINION**</u>

  This case arises out of two wire transfer payments gone awry in the early days of Russia's invasion of Ukraine.  Plaintiff Ekopel D.O.O., a Slovenian medical equipment company, was the intended beneficiary of two March 2022 wire transfers from Ukrainian companies totaling $590,000.  These payments were routed through defendant Citibank, N.A.  Because the payments were (or appeared to be) directed to sanctioned Russian financial institutions, Citibank, N.A. stopped the payments for sanctions screening, eventually returning them to the senders almost six months later.  Ekopel sued Citibank, N.A. and unnamed bank officers (collectively, "Citibank"), alleging that Citibank mishandled the wire transfers and asserting various common-law claims.

  Before the Court is Citibank's motion to dismiss.  For the reasons that follow, the Court will grant Citibank's motion.

<u>**Background**</u>

**I. Factual Background**

  The following facts are drawn from "the facts alleged in the complaint, . . . documents either attached to or incorporated in the complaint, and matters of which the court may take judicial

notice." <u>Gun Owners of Am., Inc. v. Fed. Bureau of Investigation</u>, 594 F. Supp. 3d 37, 42 (D.D.C. 2022) (quoting <u>Galvin v. Del Toro</u>, 586 F. Supp. 3d 1, 8 (D.D.C. Feb. 18, 2022)).

Ekopel is a Slovenian company that, as relevant here, specializes in exporting medical equipment.  Am. Compl. [ECF No. 15] ¶ 1.  It was the intended beneficiary of two March 2022 payments for medical equipment made by Ukrainian companies: a $545,000 payment by Ukr Med Service LLC and a $45,000 payment by Equipmed LLC.  <u>Id.</u> ¶¶ 2, 12, 13; <u>id.</u> Ex. 2, SWIFT 3.

Before diving into the details of these payments, some broader context is in order. Following Russia's invasion of Ukraine on February 24, 2022, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") issued a directive generally prohibiting U.S. financial institutions from "maintaining . . . a correspondent account or payable-through account for or on behalf of" specified Russian financial institutions and from "processing . . . transaction[s] involving" these institutions.  OFAC Directive 2 Under Exec. Order 14024, at 1 (Feb. 24, 2022) ("OFAC Dir."), https://ofac.treasury.gov/media/918471/download?inline; <u>see also</u> Exec. Order No. 14024, 86 Fed. Reg. 20249 (Apr. 15, 2021).  Sberbank Europe AG ("Sberbank") was one of the sanctioned Russian banks.  OFAC Dir. at 3.  The restrictions extended to "holding companies, affiliates, or subsidiaries" of the sanctioned entities, <u>id.</u> at 2, which would appear to include Sberbank Banka D.D., Sberbank's Slovenian subsidiary, <u>see</u> Am. Compl. ¶ 8; <u>id.</u> Ex. 1 at 4.  The sanctions were set to take effect on March 26, 2022.  OFAC Dir. at 1.

On March 1, 2022, Sberbank sold its Slovenian subsidiary to a Slovenian bank.  Am. Compl. ¶ 8.  This Slovenian bank has never been under U.S. sanctions.  <u>Id.</u> ¶ 11.  The former subsidiary, renamed "N Banka D.D.," continued to use the identifier code of its Sberbank-affiliated predecessor ("SABRSI2X").  <u>Id.</u> ¶¶ 9, 15.  N Banka D.D. is Ekopel's bank.  <u>Id.</u> ¶¶ 15, 17.

The two payments at issue in this case were sent by wire transfer via the SWIFT system, a global, interbank financial messaging service.  E.g., id. ¶¶ 18, 43; see Def.'s Mot. to Dismiss [ECF No. 17] ("Mot.") at 2 n.3; Mem. of Pl. Ekopel D.O.O. in Opp'n to Mot. [ECF No. 20] ("Opp'n") at 17 & n.7.  Wire transfers (or "electronic funds transfers") generally work as follows, as previously described by the D.C. Circuit:

> [A wire] transfer is a series of transactions by which one party, called the "originator," transfers money through the banking system to another party, called the "beneficiary."  Suppose O wants to transfer $100 to B.  If O and B have an account at Bank X, then the transaction is simple.  O can instruct Bank X, which will debit O's account and credit B's account with $100.  But suppose O has an account at Bank X, and B has an account at Bank Y.  Unless Banks X and Y are members of the same lending consortium, they must involve a third "intermediary" bank with which Banks X and Y both have accounts.  The transaction would proceed as follows: (1) O instructs Bank X to pay B; (2) Bank X debits O's account and forwards instructions to the intermediary bank; (3) the intermediary bank debits Bank X's account, credits Bank Y's account, and forwards instructions to Bank Y; and (4) Bank Y credits B's account.  The entire process occurs rapidly through a sequence of electronic debits and credits.

Heiser v. Islamic Republic of Iran, 735 F.3d 934, 935–36 (D.C. Cir. 2013) (citation and footnote omitted).  There may be more than one intermediary bank required to complete the process, in which case step three would be repeated for each intermediary bank.  See N.Y. U.C.C. Law § 4-A-104 cmt. 1 (McKinney 2024) ("N.Y. U.C.C.").  The overall wire transfer process is sometimes referred to as a "funds transfer," while each individual transaction in the chain is a "payment order."  Id.

Here, the intended routing of both wire transfers was as follows:



Am. Compl. ¶¶ 12–15, 17; id. Ex. 2, SWIFT 11; id. Ex. 3, SWIFT 1/1.[1]  The code associated with each bank is its unique identifier code (called a "SWIFT code" or a "BIC"), used to identify a specific bank for international wire transfers.  See, e.g., id. ¶¶ 14–15; Mot. at 2 n.4.

Neither wire transfer ultimately reached Ekopel.  Both were stopped for sanctions screening and eventually returned to the Ukrainian senders.  The first payment, for $545,000, was sent by Ukr Med Service LLC on March 25, 2022.  Am. Compl. ¶ 13.  Citibank stopped this payment for sanctions screening at some point in the next few days, id. ¶ 19, apparently because the payment order received by Citibank included the SWIFT codes of Sberbank and/or N Banka D.D. (which, while under new ownership as of early March, was still using the SWIFT code of its Sberbank-affiliated predecessor), see, e.g., id. Ex. 2, SWIFT 2, 11, 15.  On March 28, Citibank sent a request to BNY Mellon, the prior intermediary bank in the transfer chain, requesting "confirmation of the OFAC specific or general license" for the transfer and stating that the "funds will be held waiting [sic] your urgent reply."  Id. ¶ 19 (alteration in original).  On April 11, Globus Bank, the Ukrainian originator's bank, received the request for clarification of the purposes of the payment and provided this information.  Id. ¶¶ 20–21; see id. Ex. 2, SWIFT 2–3.  Citibank reported

---

[1] Ekopel's complaint lists each bank in this chain except Sberbank Europe AG, which the complaint refers to only as a "possibly undisclosed intermediary bank."  Am. Compl. ¶ 17.  But materials attached to the complaint indicate that this final intermediary bank was Sberbank Europe AG.  See id. Ex. 2, SWIFT 11; id. Ex. 3, SWIFT 1/1; see also id. ¶ 8 (referring to N Banka D.D. as "Sberbank's [former] subsidiary in [Slovenia]").

that this information had "cleared the sanctions issue" and that "the payment has been released as of [April 15]." Id. Ex. 2, SWIFT 7; see id. ¶¶ 22, 28.

However, Citibank proceeded to hold the payment until August 26, 2022—over four months later. Id. ¶¶ 24, 41. Citibank claims that "[b]ecause the return instruction contained the same references to the Sberbank BIC codes, the return payment was itself paused for another sanctions review." Mot. at 9. Materials attached to Ekopel's complaint lend some credence to this argument, and the complaint's allegations nod toward it as well. See Am. Compl. Ex. 2, SWIFT 22 (August 2022 message noting that the payment "has been returned" but "is being held pursuant to the applicable regulations of OFAC"); id. ¶ 24 (referencing the "purported re-verification of the payment order"). Citibank eventually processed the return transfer two days after Ekopel filed this suit. Id. ¶¶ 40–41. The $545,000 credit reached Globus Bank, the first bank in the transfer chain, in October. Id. ¶ 42.

The chain of events as to the second payment was largely similar. This payment, for $45,000, was sent by Equipmed LLC on March 16, 2022. Id. ¶ 12. It was returned to Pivdennyi Bank on March 25 with a request to clarify the payment route, and Pivdennyi identified Citibank as the relevant intermediary bank. Id. ¶¶ 44–45. Citibank stopped the payment, apparently for sanctions screening, and then issued an order to return the funds to the sender on March 28. See id. ¶¶ 46, 64. Again, this return was not processed for months—in this case not until September 20. Id. ¶¶ 47, 61. The credit reached Globus Bank in October. Id. ¶ 62.

Citibank was largely unresponsive to requests transmitted bank-to-bank along the transfer chain asking for information as to the status of both payments and demanding a cancellation of the funds transfers and a refund to the senders. See, e.g., id. ¶¶ 24–39, 47–60. As noted, Citibank did, however, respond in late April that information provided as to the $545,000 payment had "cleared

the sanctions issue" and that "the payment has been released as of [April 15]."  Id. Ex. 2, SWIFT 7; see id. ¶¶ 22, 28.  And Citibank customer service responded in July 2022 to an inquiry from Ekopel's counsel and informed him that the payments had been "returned."  Id. ¶ 72; see id. Ex. 1 at 3.

## II.    Procedural History

On August 24, 2022, Ekopel brought this action against Citibank.  See Compl. [ECF No. 1].[2]  Following service of process, Ekopel filed a notice stating that Citibank's "response to the Complaint . . . has been postponed by stipulation" because the parties were engaged in settlement discussions.  Proof of Service [ECF No. 8] at 1.  Roughly two months later—and apparently without prior notice to Citibank—Ekopel sought entry of default against Citibank for failure to appear.  See Req. to Clerk for Entry of Default [ECF No. 10]; Defs.' Opp'n to Req. to Clerk for Entry of Default [ECF No. 14] ("Default Opp'n") at 2.  Citibank promptly opposed Ekopel's request for default and filed a motion to dismiss.  See Default Opp'n at 1–2; Defs.' Mot. to Dismiss [ECF No. 13].

In April 2023, Ekopel filed an amended complaint.  This operative complaint states that Ekopel "is Plaintiff on its own behalf and as the assignee of" the two Ukrainian companies who sent the funds, Am. Compl. ¶ 2, and generally alleges that Citibank "mishandled [the two] wire transfers and made multiple misrepresentations, effectively converting the funds," id. at 1.  The amended complaint asserts common-law claims for (1) fraudulent misrepresentation, (2) fraudulent concealment, (3) conversion, (4) intentional interference with a beneficial business relationship, and (5) unjust enrichment.  See id. ¶¶ 112–57.

---

[2] Ekopel first sued BNY Mellon, the intermediary bank that preceded Citibank in the wire transfer chain.  See Compl., Ekopel D.O.O. v. BNY Mellon N.A., Civ. A. No. 22-2350 (JDB) (Aug. 9, 2022), ECF No. 1.  That action was later dismissed pursuant to a settlement agreement.  See id. ECF No. 3.

Citibank moved to dismiss Ekopel's amended complaint.  Citibank advances three arguments as to why the complaint must be dismissed.  First, it argues that it enjoys immunity because its actions were taken in good faith in connection with applicable sanctions regulations.  See Mot. at 11–18.  Second, it contends that Ekopel's common-law claims are precluded by the Uniform Commercial Code's provisions relating to commercial electronic funds transfers.  See id. at 18–21.  Finally, Citibank asserts that Ekopel fails to state a claim as to each count.  See id. at 21.

Ekopel opposed Citibank's motion to dismiss, see Opp'n, and Citibank filed a reply, see Def.'s Reply Mem. in Further Supp. of Mot. [ECF No. 21].  The motion is thus fully briefed and ripe for decision.

## Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In deciding such a motion, courts must generally "accept the [complaint's] factual allegations as true and draw all reasonable inferences in the plaintiff's favor."  Sanchez v. Off. of State Superintendent of Educ., 45 F.4th 388, 395 (D.C. Cir. 2022).  Courts need not, however, accept "legal conclusions, legal contentions couched as factual allegations, [or] unsupported factual allegations" in the complaint, Gulf Coast Mar. Supply, Inc. v. United States, 867 F.3d 123, 128 (D.C. Cir. 2017), nor must they "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice," Scahill v. District of Columbia, 909 F.3d 1177, 1186 (D.C. Cir. 2018) (internal quotation marks omitted).

In making a jurisdictional determination, "the Court must accept as true all of the factual allegations contained in the complaint, but those facts will bear closer scrutiny . . . than in resolving a 12(b)(6) motion for failure to state a claim." Ruffin v. Cong. Budget Off., 79 F. Supp. 3d 246, 248 (D.D.C. 2015) (internal quotation marks omitted).

## Analysis

### I.   Jurisdiction

Ekopel asserts jurisdiction based on diversity under 28 U.S.C. § 1332(a) because "Ekopel is a Slovenian company, and Citibank is an American national banking association." Am. Compl. ¶ 5. Citibank does not contest this assertion. Nonetheless, "courts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006).

The potential issue stems from the fact that Ekopel appears to be a limited liability company ("LLC"). See Limited Liability Company (d.o.o.), Slovenian Business Point, https://spot.gov.si/en/info/company-registration/limited-liability-company-d-o-o (Slovenian governmental website defining an LLC—as denoted by the "d.o.o" suffix—as "a legal person whose owner may be one or more domestic or foreign legal and natural persons"). In the U.S. domestic context, LLCs "are citizens of every state where their members are citizens," such that diversity jurisdiction may be defeated where a plaintiff LLC's member shares citizenship with the defendant. BGC Partners, Inc. v. Avison Young (Canada) Inc., 115 F. Supp. 3d 119, 125 (D.D.C. 2015). "The citizenship of the members of an LLC is traced all the way through—that is, when a member of an LLC is itself an LLC [or other unincorporated association, such as a partnership], the citizenship[s] of the members of that LLC [or other unincorporated association] are relevant for diversity purposes, and so on." IMAPizza, LLC v. At Pizza Ltd., 334 F. Supp. 3d 95, 129

(D.D.C. 2018) (alterations in original) (quoting Jakks Pac., Inc. v. Accasvek, LLC, 270 F. Supp. 3d 191, 195 (D.D.C. 2017)).  Here, Ekopel has not filed the required diversity disclosure statement "identify[ing] the citizenship of . . . every individual or entity whose citizenship is attributed to that party" for purposes of this inquiry.  Fed. R. Civ. P. 7.1(a)(2).

There is an added wrinkle when it comes to foreign business entities.  The Fifth and Ninth Circuits have adopted a "juridical person" test, under which if the business entity is treated as a legal person in its home country, it is a citizen of that jurisdiction for diversity purposes.  See Berik Stiftung v. Plains Mktg., L.P., 603 F.3d 295, 298–99 (5th Cir. 2010); Cohn v. Rosenfeld, 733 F.2d 625, 629 (9th Cir. 1984).  But the Seventh and Eighth Circuits consider specific aspects of the foreign business entity to determine whether its closest domestic analogue is a corporation versus an LLC or other unincorporated association—and, if the latter, the foreign business entity takes the citizenship of each of its members.  See Jet Midwest Int'l Co. v. Jet Midwest Grp. LLC, 932 F.3d 1102, 1105 (8th Cir. 2019); Lear Corp. v. Johnson Elec. Holdings Ltd., 353 F.3d 580, 583 (7th Cir. 2003); see generally Elisabeth C. Butler, Note, Diversity Jurisdiction and Juridical Persons: Determining the Citizenship of Foreign-Country Business Entities, 97 Tex. L. Rev. 193 (2018) (discussing the circuit split).  The D.C. Circuit does not appear to have taken a position.  Under the latter approach, if the Court were to conclude that Ekopel was analogous to an LLC, and if any of Ekopel's members shared citizenship with Citibank, then diversity jurisdiction would not exist.

The Court need not, however, wade into this thicket or require Ekopel to file an affidavit setting out its membership.  Jurisdiction is proper for the alternative reason that the Edge Act, 12 U.S.C. § 611 et seq., confers federal question jurisdiction over the substance of this suit.  The Edge Act provides, in relevant part:

> Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking . . . shall be deemed to arise under the laws of the United States . . . .

12 U.S.C. § 632.  Thus, "three things must be true" for Edge Act jurisdiction to exist: "first, the suit must be a civil action; second, a 'corporation organized under the laws of the United States' must be a party; and third, the suit must 'aris[e] out of transactions involving international or foreign banking [or other predicates not relevant here].'" U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC, 826 F. App'x 115, 116 (2d Cir. 2020) (first alteration in original) (quoting 12 U.S.C. § 632).

All three criteria for Edge Act jurisdiction are met here.  This is a civil action and Citibank is a U.S. corporation.  See, e.g., Corporate Disclosure Statement [ECF No. 12].  And wire transfers directed to foreign banks fall "squarely within" the "involving international or foreign banking" requirement.  Burge v. JPMorgan Chase Bank, N.A., Civ. A. No. 122-00607 (RLY), 2022 WL 18540501, at *3 (S.D. Ind. Nov. 18, 2022); see also, e.g., In re Citibank Aug 11, 2020 Wire Transfers, Civ. A. No. 20-6539 (JMF), 2021 WL 606167, at *13 (S.D.N.Y. Feb 16, 2021).  Hence, the suit "shall be deemed to arise under the laws of the United States," 12 U.S.C. § 632, and the Court has federal question jurisdiction, see 28 U.S.C. § 1331.[3]

## II.   Merits

Citibank contends that Ekopel's complaint must be dismissed for three reasons: (1) Citibank is entitled to immunity because its actions were taken in good faith in connection with applicable sanctions regulations, (2) Ekopel's claims are precluded by the Uniform Commercial

---

[3] There is some question as to whether venue is proper in the District of Columbia.  Ekopel's only allegation on this point appears to be that Citibank "has 16 branches in Washington, D.C."  Am. Compl. ¶ 3.  But Citibank never challenged venue, so the Court will deem any possible venue objection forfeited.  See, e.g., Dalton Trucking, Inc. v. U.S. E.P.A., 808 F.3d 875, 880 (D.C. Cir. 2015); 28 U.S.C. § 1406(b).

Code, and (3) Ekopel has failed to state a claim as to each count.  <u>See</u> Mot. at 11–21.[4]  The Court

rejects the first argument as premature, accepts the second as to Ekopel's claims for conversion

and unjust enrichment, and accepts the third as to Ekopel's claims for fraudulent misrepresentation,

fraudulent concealment, and tortious interference with a business relationship.

### A.  IEEPA Immunity

Citibank's lead argument is that Ekopel's complaint must be dismissed because the "broad

immunity provision" in the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C.

§ 1701 <u>et seq.</u>, "protects Citibank's good-faith actions to comply with OFAC sanctions."  Mot. at

11; <u>see id.</u> at 11–18.  IEEPA "authoriz[es] declarations of emergencies regarding foreign threats

and the imposition of sanctions on persons and states in response to those emergencies."  <u>Deripaska</u>

<u>v. Yellen</u>, No. 21-5157, 2022 WL 986220, at *1 (D.C. Cir. Mar. 29, 2022) (per curiam).  The

Russia sanctions at issue here were imposed pursuant to this authorization.  <u>See, e.g.</u>, 86 Fed. Reg.

at 20249.  IEEPA provides, as relevant here, that:

> Compliance with any regulation, instruction, or direction issued under this chapter
> shall to the extent thereof be a full acquittance and discharge for all purposes of the
> obligation of the person making the same.  No person shall be held liable in any
> court for or with respect to anything done or omitted in good faith in connection
> with the administration of, or pursuant to and in reliance on, this chapter, or any
> regulation, instruction, or direction issued under this chapter.

---

[4] Ekopel alleges that it is the assignee of claims by Equipmed LLC and Ukr Med Service LLC.  <u>See</u> Am. Compl. ¶ 2; Opp'n at 1, 11.  Citibank does not address this issue.  Given this lack of opposition and the fact that the assignment issue is not jurisdictional in this case, <u>cf.</u> <u>Bailey v. Avis Budget Grp., Inc.</u>, Civil A. No. 22-1647 (LNH), 2023 WL 375371, at *2 (S.D. Tex. Jan. 23, 2023), the Court will assume for purposes of this motion that the assignments were valid, <u>see, e.g.</u>, <u>Anjani Sinha Med. P.C. v. Empire HealthChoice Assurance, Inc.</u>, Civ. A. No. 21-138 (RPK), 2023 WL 5935787, at *4 (E.D.N.Y. Sept. 12, 2023); <u>Outsource Servs. Mgmt., LLC v. Lake Austin Properties I, Ltd.</u>, Civ. A. No. 09-1928-ORL-35 (DAB), 2010 WL 11470904, at *2 (M.D. Fla. June 15, 2010).

Two other housekeeping matters.  First, because the parties stipulated to a stay of Citibank's obligation to respond to Ekopel's original complaint, the Court will deny Ekopel's March 2023 request for entry of default.  Second, because Ekopel filed an amended complaint, the Court will deny Citibank's motion to dismiss Ekopel's initial complaint as moot.  <u>See, e.g.</u>, <u>HIV & Hepatitis Pol'y Inst. v. U.S. Dep't of Health & Hum. Servs.</u>, Civil A. No. 22-2604 (JDB), 2023 WL 6388932, at *7 n.2 (D.D.C. Sept. 29, 2023).

50 U.S.C. § 1702(a)(3).  Citibank argues that this immunity provision applies because Citibank's challenged actions were carried out in "good faith" in connection with the sanctions.

The Court declines to accept Citibank's immunity argument at this stage in the proceedings.  "[A]n affirmative defense may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint."  Greer v. Bd. of Trustees of Univ. of D.C., 113 F. Supp. 3d 297, 306 (D.D.C. 2015) (quoting Smith–Haynie v. District of Columbia, 155 F.3d 575, 578 (D.C. Cir. 1998)).  Here, the facts giving rise to the defense are not clear from the face of the complaint or from materials attached thereto or subject to judicial notice.[5]  True, these materials generally establish that Citibank initially stopped both payments for sanctions screening.  See, e.g., Am. Compl. ¶¶ 19, 64.  And they arguably suggest that Citibank engaged in another round of sanctions screening after issuing a return order for the payments.  See id. ¶ 24; id. Ex. 2, SWIFT 22.  But the mere fact of some nexus to sanctions regulations does not affirmatively establish "good faith" on this sparse record.  Notably, even accepting the premise of a second round of sanctions screening on the outgoing payments, it is not clear why Citibank held these payments for another four and six months (respectively) when it was able to complete the initial sanctions screening for both payments in a matter of days or weeks.  Nor is it clear why Citibank allegedly failed to communicate with other banks in the transfer chain during this period. There are simply too many factual gaps to reach a determination as to "good faith."  Hence, the Court rejects Citibank's IEEPA immunity argument at this time.  See Walker v. S.W.I.F.T. SCRL,

---

[5] The Court does not rely on the exhibits attached to Citibank's motion to dismiss (except to the extent these SWIFT messages are also attached to Ekopel's amended complaint, which most of them are).  See Mot. Exs. A–I. Even if the Court did consider these exhibits, however, it would not alter the Court's conclusion that a "good faith" determination is premature at this time.

491 F. Supp. 2d 781, 788–89 (N.D. Ill. 2007) (similarly rejecting an IEEPA immunity defense at the motion-to-dismiss stage).[6]

### B.  U.C.C. Preclusion

Citibank's second argument is more persuasive.  Citibank asserts that, as an intermediary bank, it is not liable to either an originator or a beneficiary under the Uniform Commercial Code ("U.C.C."), and that the U.C.C. precludes inconsistent common-law claims.  See Mot. at 18–21.

The parties agree that New York law governs the substance of this suit, see id. at 4 n.6; Opp'n at 15–20, and the Court need not and will not second-guess that conclusion, see, e.g., Boomer Dev., LLC v. Nat'l Ass'n of Home Builders of U.S., 258 F. Supp. 3d 1, 9–10 (D.D.C. 2017); Davis v. Grant Park Nursing Home LP, 639 F. Supp. 2d 60, 64–65 (D.D.C. 2009).  New York has adopted the Uniform Commercial Code, including U.C.C. Article 4-A, which "governs the procedures, rights, and liabilities arising out of commercial electronic funds transfers."  Grain Traders, Inc. v. Citibank, N.A., 160 F.3d 97, 100 (2d Cir. 1998); see N.Y. U.C.C. § 4-A-101 et seq.

Ekopel contends that Article 4-A is inapplicable here because it is preempted by the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 et seq.  See Opp'n at 6.  This contention is Ekopel's only meaningful response to Citibank's U.C.C.-based arguments.  See id. at 5–7.  The Court rejects the argument.  The EFTA's "primary objective . . . is the provision of individual consumer rights," not the regulation of transfers between financial institutions.  15 U.S.C.

---

[6] The Court need not reach Citibank's contention that IEEPA provides immunity from suit rather than just immunity from liability and that this represents a limitation on jurisdiction. See Mot. at 11–12; id. at 12 n.10.  Citibank does not meaningfully explain how this distinction affects the Court's inquiry in this context.  And in any event, Citibank's proffered analogy to the Foreign Sovereign Immunities Act context supports the Court's approach. See id. at 12 n.10.  There, "[i]f the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true," rendering "[t]he Rule 12(b)(1) standard in th[at] context similar to that of Rule 12(b)(6)."  Simon v. Republic of Hungary, 77 F.4th 1077, 1116 (D.C. Cir. 2023) (internal quotation marks omitted).  Here, where Citibank's "good faith" immunity argument rests on Ekopel's allegations, any 12(b)(1) inquiry would seem to be largely coterminous with one under 12(b)(6).

§ 1693(b).  The EFTA applies to "consumer[s]," defined as "natural person[s]," and to consumer "account[s]," defined as accounts "established primarily for personal, family, or household purposes."  Id. § 1693a(2), (6); see also, e.g., Gilbert & Caddy, P.A. v. JP Morgan Chase Bank, N.A., 193 F. Supp. 3d 1294, 1305–06 (S.D. Fla. 2016).  And the term "electronic fund transfer" under the EFTA "does not include . . . [a]ny transfer of funds through Fedwire or through a similar wire transfer system that is used primarily for transfers between financial institutions or between businesses."  12 C.F.R. § 205.3(c)(3); see 15 U.S.C. § 1693a(7)(B).  In short, "[t]he types of transfers covered by the [EFTA] are essentially different from the wholesale wire transfers that are the primary focus of Article 4A."  N.Y. U.C.C. § 4-A-108 cmt.  Article 4-A is not preempted by the EFTA as relevant to this case, which involves commercial wire transfers between businesses.[7]

> The relevant provision of Article 4-A is § 4-A-402.  That provision states, inter alia:
>
> If the sender of a payment order pays the order and was not obliged to pay all or part of the amount paid, the bank receiving payment is obliged to refund payment to the extent the sender was not obliged to pay.  Except as provided in Sections 4-A-204 and 4-A-304, interest is payable on the refundable amount from the date of payment.

N.Y. U.C.C. § 4-A-402(4).  The "sender" is "the person giving the instruction to the receiving bank."  Id. § 4-A-103(1)(e).  The "receiving bank" (or here, the "bank receiving payment") is "the bank to which the sender's instruction is addressed."  Id. § 4-A-103(1)(d).  And a "payment order" is "an instruction of a sender to a receiving bank . . . to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary."  Id. § 4-A-103(1)(a).

---

[7] The Court recognizes that Article 4-A's wire transfer rules may be preempted to the extent they are inconsistent with OFAC blocking regulations.  See Est. of Levin v. Wells Fargo Bank, N.A., 45 F.4th 416, 422–23 (D.C. Cir. 2022); see also Permanent Ed. Bd. for the U.C.C., Commentary No. 16, §§ 4A-502(d) and 4A-503, at 5 (2009) ("PEB Commentary No. 16").  Neither party addresses this issue.  Given Ekopel's lack of argument on this point and its contention that OFAC sanctions are not even applicable here, see Opp'n at 5–6, 9–10, the Court will assume for purposes of this analysis that the OFAC regulations are not in conflict with Article 4-A and that Article 4-A provides the default liability scheme.

The critical point is that § 4-A-402 creates obligations only between the parties to each link in the transfer chain (i.e., each payment order), not as to all parties involved in the funds transfer generally.  The U.C.C. commentary to this section explains this privity-like requirement:

> This "money-back guarantee" is an important protection of Originator.  Originator is assured that it will not lose its money if something goes wrong in the transfer.  For example, risk of loss resulting from payment to the wrong beneficiary is borne by some bank, not by Originator.  The most likely reason for noncompletion is a failure to execute or an erroneous execution of a payment order by Bank A [(Originator's bank)] or an intermediary bank.  Bank A may have issued its payment order to the wrong bank or it may have identified the wrong beneficiary in its order.  The money-back guarantee is particularly important to Originator if noncompletion of the funds transfer is due to the fault of an intermediary bank rather than Bank A.  In that case Bank A must refund payment to Originator, and Bank A has the burden of obtaining refund from the intermediary bank that it paid.

Id. § 4-A-402 cmt. 2 (emphasis added).  Commentary from the Permanent Editorial Board for the U.C.C. makes the point even more explicit:

> [U]nder the Article 4A structure, the issuance and acceptance of payment orders create rights and obligations only as between the sender of the payment order and its receiving bank (e.g., between originator and originator's bank as to the originator's payment order), between the originator's bank and an intermediary bank as to the originator's bank's payment order, between the intermediary bank and the beneficiary bank as to the intermediary bank's payment order, and finally as between the beneficiary bank that has accepted a payment order and the beneficiary. . . .  [T]he originator does not have any claim against the intermediary bank for return of the value in the event the funds transfer is not completed.  Rather, the only party with a claim against the intermediary bank is the sender to that bank, which is typically the originator's bank.  In an uncompleted funds transfer, it is the originator's bank that must refund the value to the originator.

PEB Commentary No. 16 at 2–3 (emphasis added); see also Est. of Levin, 45 F.4th at 422 (relying on Commentary No. 16 as indicative of the meaning of the U.C.C.).

The Second Circuit's robust body of electronic-funds-transfer jurisprudence reinforces this view.  See Grain Traders, 160 F.3d at 101 (concluding that § 4-A-402 "effect[s] an orderly unraveling of a funds transfer in the event that the transfer was not completed, and accomplishe[s] this by incorporating a 'privity' requirement into the 'money back guarantee' provision"); see also,

e.g., Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co., 609 F.3d 111, 121 (2d Cir. 2010).  At least

two judges in this District have reached the same conclusion.  See Levin v. Islamic Republic of

Iran, 523 F. Supp. 3d 14, 21–22 (D.D.C. 2021), rev'd and remanded on other grounds sub nom.

Est. of Levin, 45 F.4th 416; United States v. BCCI Holdings (Luxembourg), S.A., 977 F. Supp.

12, 18 (D.D.C. 1997).  And the D.C. Circuit affirmed one of these judgments, albeit in an

unpublished order.  See United States v. BCCI Holdings (Luxembourg), S.A., No. 97-5261, 1998

WL 388793, at *1 (D.C. Cir. 1998) (per curiam); see also Est. of Levin, 45 F.4th at 422 (citing

Grain Traders favorably as to the function and purpose of § 4-A-402).

The U.C.C. also precludes common-law claims to the extent that they "impose liability

inconsistent with the rights and liabilities expressly created by Article 4-A."  Grain Traders, 160

F.3d at 103; see N.Y. U.C.C. § 4-A-102 cmt. (noting that the Article 4-A rules are "intended to be

the exclusive means of determining the rights, duties and liabilities of the affected parties in any

situation covered by particular provisions of the Article" and that "resort to principles of law or

equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent

with those stated in this Article").

Here, Citibank asserts that all five of Ekopel's common-law claims are precluded by the

U.C.C., arguing that "neither an originator . . . nor a putative beneficiary . . . has any claim at all

against an intermediary bank."  Mot. at 20.  That is not quite right.  "Not all common law claims

are per se inconsistent with [the Article 4-A] regime."  Ma v. Merrill Lynch, Pierce, Fenner &

Smith, Inc., 597 F.3d 84, 89 (2d Cir. 2010); see also, e.g., Patco Const. Co. v. People's United

Bank, 684 F.3d 197, 215–16 (1st Cir. 2012); Regions Bank v. Provident Bank, Inc., 345 F.3d 1267,

1274–75 (11th Cir. 2003).  Rather, common-law claims are precluded only to the extent that they

"impose liability inconsistent with" Article 4-A.  Grain Traders, 160 F.3d at 103 (emphasis added).

"Claims that, for example, are not about the mechanics of how a funds transfer was conducted may fall outside of [Article 4-A]."  Ma, 597 F.3d at 89.

Ekopel's claims for conversion and unjust enrichment fall squarely within Article 4-A and are thus precluded.  Ekopel generally alleges that Citibank improperly retained the funds when it had an obligation to return them.  See, e.g., Am. Compl ¶¶ 135, 153.  But § 4-A-402 explicitly addresses parties' obligations if a wire transfer miscarries, and makes clear that neither the originator nor the beneficiary has a claim against an intermediary bank "for return of the value in the event the funds transfer is not completed."  PEB Commentary No. 16 at 3; see also, e.g., Grain Traders, 160 F.3d at 105.

However, it is less clear that Ekopel's remaining claims are precluded.  Citibank has not identified any U.C.C. provisions that are inconsistent with these claims, which relate to alleged misrepresentations and intentional interference with Ekopel's business relationship with the Ukrainian originators.  And these claims relate to alleged wrongdoing distinct from the mechanics of the funds transfer.  See Ctr.-Point Merch. Bank Ltd. v. Am. Express Bank Ltd., 913 F. Supp. 202, 205, 208–09 (S.D.N.Y. 1996) (dismissing various counts as precluded by Article 4-A but declining to dismiss portions of a misrepresentation count).

Ekopel may well have forfeited any contention along these lines by failing to make this argument—indeed, by failing to make any meaningful argument as to Citibank's U.C.C.-based theories for dismissal (other than the misplaced EFTA preemption argument).  See Colindres v. U.S. Dep't of State, 71 F.4th 1018, 1025 (D.C. Cir. 2023).  But the Court will nonetheless proceed to consider whether Ekopel has stated a claim on these remaining counts under the Rule 12(b)(6) standard.

### C.  Failure to State a Claim

Even assuming that the U.C.C. does not preclude Ekopel's claims for fraudulent misrepresentation, fraudulent concealment, and tortious interference with a business relationship, Ekopel has failed to state a claim as to these remaining counts.

First, to establish a claim for fraudulent misrepresentation under New York law, a plaintiff must show "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." Mandarin Trading Ltd. v. Wildenstein, 944 N.E.2d 1104, 1108 (N.Y. 2011) (internal quotation marks omitted).[8]  Here, Citibank argues that Ekopel has failed to plausibly allege "knowledge of any statement's falsity or intent to deceive."  Mot. at 21.

The Court agrees that Ekopel has failed to state a claim as to fraudulent misrepresentation. To begin, most of the complaint's allegations regarding Citibank's failure to respond to inquiries do not support an affirmative claim for fraudulent misrepresentation.  See, e.g., Am. Compl. ¶¶ 24–39, 47–60.  And generalized allegations regarding false statements, e.g., id. ¶ 119, do not satisfy Rule 9(b)'s requirement to "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b).

Ekopel does point to two specific instances of alleged false statements: (1) Citibank's April 2022 response that "the payment has been released as of [April 15]," id. Ex. 2, SWIFT 7; see id. ¶¶ 22, 67, and (2) Citibank's July 2022 response to Ekopel's counsel that the payments had been "returned," id. ¶¶ 72–73; see id. Ex. 1 at 3.  But there is some question as to whether Citibank even

---

[8] Ekopel's complaint asserts a claim for "misrepresentation."  See Am. Compl. ¶¶ 112–21.  Given the case law cited in the complaint and in Ekopel's briefing, see id. ¶ 113; Opp'n at 15–16, the Court will construe this as a claim for fraudulent (rather than negligent) misrepresentation.

knew these statements to be false.  Materials attached to the complaint indicate that Citibank in fact understood the payments to be "released" or "returned," even if the return order itself was subject to further sanctions screening.  <u>See</u> <u>id.</u> Ex. 2, SWIFT 22; <u>see also</u> <u>id.</u> ¶ 23.  For similar reasons, the complaint fails to plausibly allege an intention on the part of Citibank to induce Ekopel's reliance.  And in any event, it does not appear that Ekopel justifiably relied on these alleged misstatements.   To the contrary, Ekopel's counsel followed up to the July 2022 communication from Citibank customer service with a detailed list of questions to substantiate the return details.  <u>See</u> <u>id.</u> Ex. 1 at 1–2.  And while Ekopel sued BNY Mellon shortly thereafter, allegedly in reliance on Citibank's statement, <u>id.</u> ¶ 120, it did so before either (1) receiving an answer from Citibank to the detailed list of follow-up questions or (2) receiving an answer from BNY Mellon as to a similar inquiry sent to that bank, <u>see</u> <u>id.</u> ¶¶ 72–76, 83–88.  For all of these reasons, the Court concludes that Ekopel's complaint fails to state a claim for fraudulent misrepresentation.

Second, to establish a claim for fraudulent concealment, a plaintiff must demonstrate each of the elements of fraudulent misrepresentation plus "a fiduciary or confidential relationship between the parties that would impose a duty to disclose material information." <u>Cantor v. Villucci</u>, 212 A.D.3d 765, 766 (N.Y. App. Div. 2023); <u>see</u> <u>Mandarin Trading Ltd.</u>, 944 N.E.2d at 1108.  To start, this claim fails for the reasons stated above.  But it also fails because Ekopel's complaint does not plausibly allege a duty of disclosure.  <u>See</u> Mot. at 21.  Ekopel's complaint contains general allegations that Citibank had an affirmative duty to disclose information due to "[t]he regulations of SWIFT, banking regulations and practices."  Am. Compl. ¶ 124.  But Ekopel has not identified any regulation that actually imposes such a duty.  <u>See</u> Opp'n at 17 (reiterating general language from complaint).  Hence, the Court declines to credit this "legal contention[] couched as [a] factual

allegation[].” Gulf Coast Mar. Supply, Inc., 867 F.3d at 128.  The Court similarly rejects Ekopel's assertion that the July 2022 response from Citibank customer service violated unspecified “bar regulations.” See Am. Compl. ¶¶ 125–26.

Finally, “[t]o prevail on a claim for tortious interference with business relations, a party must prove: (1) that it had a business relationship with a third party; (2) that the defendant knew of that relationship and intentionally interfered with it; (3) that the defendant acted solely out of malice or used improper or illegal means that amounted to a crime or independent tort; and (4) that the defendant's interference caused injury to the relationship with the third party.” Stuart's, LLC v. Edelman, 152 N.Y.S. 3d 472, 476 (N.Y. App. Div. 2021).[9]  Citibank argues that this claim fails because Ekopel's complaint “does not plausibly allege that Citibank . . . knew of the allegedly harmed business relationships and intentionally caused their termination (or even that they were terminated).”  Mot. at 21.  The Court agrees that Ekopel has not plausibly alleged that Citibank intentionally interfered with the business relationship between Ekopel and the Ukrainian originators.  As Citibank notes, it was an intermediary bank in a six-bank funds transfer chain, see id.; Am. Compl. ¶ 17, and the complaint does not plausibly allege any intention on the part of Citibank to interfere with the business relationship between Ekopel and the Ukrainian companies. See, e.g., Baystate Techs., Inc. v. Bentley Sys., Inc., 946 F. Supp. 1079, 1093 (D. Mass. 1996) (rejecting tortious interference claim where any alleged interference was “unintentional”).[10]

*     *     *

---

[9] Ekopel's complaint asserts a claim for “intentional interference with beneficial business relationship.” See Am. Compl. ¶¶ 145–51.  Hence, the Court will construe this as a claim for tortious interference with business relations rather than tortious interference with contract. See, e.g., Stuart's, LLC, 152 N.Y.S. 3d at 476; see also Am. Compl ¶ 146; Opp'n at 18–19.

[10] Article 4-A reinforces this conclusion.  Permitting Ekopel's claim to proceed on these facts—essentially just that Citibank knew the identities of the originators and the beneficiary—would open the door to tort liability in a broad range of miscarried transactions.  The breadth of this potential liability at least raises a question as to whether it is inconsistent with the scheme established in § 4-A-402.

To sum up, the Court concludes that (1) Citibank's IEEPA immunity argument is premature, (2) Citibank's U.C.C. preclusion argument disposes of Ekopel's conversion and unjust enrichment claims, and (3) Ekopel's complaint fails to state a claim as to the remaining claims.

## III. Conclusion

For the foregoing reasons, the Court will grant Citibank's motion to dismiss.   An accompanying Order will issue on this date.

_____
/s/
JOHN D. BATES
United States District Judge

Dated: <u>February 9, 2024</u>